UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KELLY E. BROWN,                       )
                                      )     CIVIL ACTION NO.
                Plaintiff.            )     1:14-CV-10801-DPW
                                      )
v.                                    )
                                      )
CAROLYN W. COLVIN                     )
ACTING COMMISSIONER OF                )
SOCIAL SECURITY,                      )
                                      )
                Defendant.            )


MEMORANDUM AND ORDER
June 30, 2015

Kerry E. Brown instituted this action pursuant to 42 U.S.C. 405(g), seeking judicial review of a final administrative decision denying her claim for social security disability insurance benefits.  She seeks to have the Commissioner's decision remanded to reassess her eligibility and issue a new decision.

## I.  BACKGROUND

### A.  *Procedural History*

Ms. Brown filed applications for SSDI benefits on June 14, 2010 pursuant to Title II of the Social Security Act, alleging disability beginning October 23, 2007.  Her insured status under the Act lapsed on December 31, 2009.  The application was denied initially on September 23, 2010.  That denial was affirmed upon reconsideration by the Social Security Administration ("SSA") on

March 11, 2011.  After a video hearing on November 2, 2012, an Administrative Law Judge issued a decision on November 15, 2012, finding the claimant was not disabled from her alleged onset date through her date last insured. On December 6, 2013, the Appeal Council of SSA denied the claimant's request for review and the ALJ's decision became final.  Ms. Brown then filed the instant action with this Court, seeking judicial review of the decision pursuant to 42 U.S.C. 405 (g).

**B.    *Medical Chronology***

Ms. Brown was born on September 5, 1974.  She was thirty-three years old on her alleged onset date of disability and thirty-five years old on her date last insured.  She had a high school education and had been a secretary and data entry clerk.

Ms. Brown first sought medical treatment from her primary care physician Roberts Gagnon, M.D. for limb pain and paresthesias (a sensation of tingling or prickling of a person's skin) beginning on October 24, 2007.  She reported that her symptoms were of severe intensity and they occurred every couple of minutes.  She claimed that the symptoms were aggravated by her typing, filing and fine manipulation.  Dr. Gagnon assessed her condition to be carpal tunnel syndrome (a numbness and tingling in the hand caused by a pinched nerve in the wrist), for which he prescribed ibuprofen.

On December 17, 2007, Ms. Brown went to see Dina Galvin, M.D. for her continuing numbness and tingling. She reported that the symptoms had become constant even without working in the past six months. She claimed that she started dropping objects because she was unable to feel them. At Dr. Galvin's recommendation, she underwent a nerve conduction study on January 1, 2008. The study only revealed a moderate right median neuropathy at the right wrist. Dr. Galvin concluded that Ms. Brown did not have clinical evidence of carpal tunnel syndrome but would benefit from the physical therapy for her thoracic outlet syndrome (a condition involving compression of the nerves or blood vessels causing pain in the neck or shoulder and numbness in hands). Ms. Brown subsequently started physical therapy from January 21, 2008. However, she was put on hold on March 28, 2008 due to the lack of improvement in her numbness and paresthesias.

On January 17, 2008, Ms. Brown sought treatment with neurologist Donald S. Marks, M.D. for numbness and paresthesias in both hands. Dr. Marks performed a Nerve Conduction Velocity test, finding nothing but a moderate R median neuropathy across the R wrist. He suggested clinical correlation. On that same day, Ms. Brown consulted Dr. Galvin, who concluded again that Ms. Brown's numbness and tingling resulted from thoracic outlet syndrome and that she may benefit from physical therapy.

Ms. Brown went to see Dr. Gagnon on February 11, 2008.  She expressed her frustration about Dr. Galvin's failure to explain her thoracic outlet syndrome.  After reexamination, Dr. Gagnon assessed her condition to be carpel tunnel syndrome and thoracic outlet syndrome.  Dr. Gagnon ordered a MRI scan of Ms. Brown's cervical spine.  The test, performed on February 15, 2008, disclosed minimal central posterior disc protrusion at the C5-6 level and muscle spasm.  On her third visit to Dr. Gagnon dated March 18, 2008, she complained about the persistent numbness and paresthesia and, in addition, problems with her eyesight. Dr. Gagnon believed that Ms. Brown was disabled on the basis at these symptoms.

On April 8, 2008, Ms. Brown sought treatment from Mazen Eneyni, M.D. of Angels Neurological Centers.  In addition to pain and numbness in both hands, she also reported fatigue and body aches.  On examination, Ms. Brown showed normal gait, strength, sensation, and reflexes.  Her cognition was generally intact except that she had blurring of the nasal margins without swelling.  Dr. Eneyni's impression included carpal tunnel syndrome, fibromyalgia (a condition of widespread muscle pain or tenderness) and pseudopappiledema (optic disc swelling that is secondary to an underlying process).  He then ordered a new EMG, which was administered by Federick Nahm, M.D., on April 19, 2008.  The study showed reduced median and ulnar motor response

amplitudes on the right, which Dr. Nahm indicated might be "suggestive of a low trunk plexopathy as in thoracic outlet syndrome".

On April 18, 2008, Ms. Brown visited Aleksander Feoktistov, M.D., at the Raynham Rheumatology office. She reported persistent pain in joints, random sensations of numbness and tingling, as well as sleep problems and episodes of profound fatigue. She also complained about stomach problems with constipation or diarrhea. Upon examination, Ms. Brown was found to have mild tenderness to palpation in the proximal interphalangeal joints of the hands bilaterally and in the wrists. She also had anterior shoulder tenderness on palpation and tenderness to digital palpation at the occiput, trapezius, second lib, lateral epicondyle, medially over knees, greater trochanter and gluteal area bilaterally. Yet she did not appear to have acute pain. Dr. Feoktistov concluded that Ms. Brown presented with symptoms of fibromyalgia possibly secondary to sleeping problems.

Upon referral by Dr. Feoktistov, Ms. Brown visited Imad J. Bahhady, M.D., for her insomnia and fatigue on April 29, 3008. She reported excessive daytime sleepiness, snoring and sleep onset and maintenance insomnia. The doctor assessed obstructive sleep apnea and psychophysiological insomnia, which arose out of her stress and pain associated with fibromyalgia.

Ms. Brown returned to Dr. Feoktistov on May 2, 2009. She complained that she had an increase in joint pain. She reported that a few weeks earlier she had to stay in bed due to excessive fatigue and that this profound episode resolved after a few days. Dr. Feoktistov concluded that she had symptoms of fibromyalgia and symptoms suggestive of carpal tunnel syndrome. He also noticed Ms. Brown's depressive symptoms because of frustration over her level of function.

By referral of Dr. Bahhady and Dr. Gagnon, Ms. Brown visited Carolyn M. D'Ambrosio, M.D., for polysomnography on June 4, 2008. The examination resulted in no determination because Ms. Brown could not achieve any sleep due to her pain. Dr. D'Ambrosio performed another polysomnography on September 22, 2008. The study demonstrated moderate sleep disordered breathing with prominent snoring and paradoxical breathing.

On July 9, 2008, Ms. Brown was examined by Peter Schuter, M.D., a rheumatologist. She complained about her numbness, achiness, fatigue and flu-like symptoms under the sun. She also reported her sleep problems and cognitive defects as a result. She had symptoms suggestive of lupus, such as arthritis, skin lesions, and canker sores. The physical examination showed that she was clearly overweight, had marked limitation in internal rotation in both shoulders and decreased rotation of both hips, and was tender everywhere in her body. Dr. Schuter opined that

her symptoms were consistent with either lupus, or fibromyalgia, or both.  He recommended that Ms. Brown lose 100 pounds once the pain level went down and her sleep got better.

On July 16, 2008, Ms. Brown visited Dr. Gagnon for the fourth time since her alleged onset date of disability.  Dr. Gagnon assessed her condition to be carpal tunnel syndrome, thoracic outlet syndrome and fibromyalgia.  On July 28, 2008, he completed a "Continuing Disability Claim Form", in which he opined that Ms. Brown had been unable to work since February 2, 2008 and that she could not perform any lifting or typing.  In a letter dated September 26, 2008, Dr. Gagnon wrote that Ms. Brown was incapacitated by medical problems as well as fatigue and numbness.  He expected Ms. Brown would return to work in three to six months but that the amount and the type of work would be limited.

On October 2, 2008, Ms. Brown was evaluated by Carolyn B. Becker.  The review of her symptoms demonstrated positive pain, numbness, loss of strength and feeling in both her hands, arms, feet and legs, muscle inflammation, muscle pain and stiffness, blurry vision, tender points, intolerance to pressure on her skin, extreme fatigue, insomnia, terrible headaches, and alternating diarrhea and constipation. Upon examination, Dr. Becker opined that Ms. Brown's symptoms were complex and most consistent with fibromyalgia.  On October 9, 2008, Ms. Brown

went to see another neurologist Slavenka Kam-Hanson, M.D.  Upon
examination, Dr. Kam-Hanson concluded that Ms. Brown did not
have a neurological disease, except some chronic pain syndrome.
He also questioned whether any further MRI test would change the
diagnosis.

On December 9, 2008, Ms. Brown visited Michael Biber, M.D.
Upon his examination, Dr. Biber concluded that there were no
neurologic signs except for possible Tinel's (irritated nerves
detected by lightly tapping over the nerve to elicit a sensation
of tingling) over the right median nerve at the wrist.  He also
opined that some of her sensory symptoms could represent a
conversion reaction due to the nonanatomic distribution of her
sensory symptoms and her eight-month history of anxiety.

On February 12, 2009, Ms. Brown underwent laparoscopic
Roux-en-Y gastric bypass surgery (a weight loss procedure) by
Ali Tavakkolizadeh, M.D.  On March 25, 2009, Dr. Tavakkolizadeh
wrote that the surgery was uneventful and that Ms. Brown was
doing wonderfully well.  Since the surgery, she had successfully
lost 57 pounds.  Although there was no noticeable decrease in
the frequency of her fibromyalgia attacks, Ms. Brown reported
that she felt better and more energized in between these
attacks.

Ms. Brown did not seek further medical treatment until July
1, 2010, when she was referred to Roland Chan, M.D. by Dr.

Gagnon.  She reported diffuse, constant and severe pain with
fatigue.  The physical examination revealed normal gait and
station and no misalignment, asymmetry, crepitation, defects,
tenderness or masses upon palpation.  She also demonstrated
normal muscle strength and tone with no atrophy.  She
experienced no pain, crepitation or contracture with range of
motion.  Based on his examination, Dr. Chan assessed probable
fibromyalgia.  He opined that Ms. Brown should be encouraged to
exercise, lose weight and remain productive full time in the
workforce.

On August 5, 2010, Dr. Gagnon, upon the request of
Massachusetts Rehabilitation Commission, opined about Ms.
Brown's disability and stated that she was unable to work due to
the chronic muscle pain she suffered from fibromyalgia.

On September 7, 2010, Beth Schaff, M.D., a State agency
medical consultant, completed a physical functional capacity
assessment on Ms. Brown.  She opined that Ms. Brown could carry
or lift ten pounds occasionally and less than ten pounds
frequently, stand or walk three to four hours in an eight hour
workday, sit for a total of about six hours in an eight hour
workday, and push or pull occasionally with limitation in upper
extremities.  She observed that Ms. Brown occasionally had
difficulty in climbing, balancing, stooping, kneeling, crouching
and crawling.  She also wrote that Ms. Brown was occasionally

unable to perform bilateral overhead reaching, grasping and twisting. Despite these limitations, Dr. Schaff found that Ms. Brown had no visual, communicative or environmental limitations.

On September 22, 2010, John Warren, Ed. D., a state agency psychological consultant, reviewed Ms. Brown's medical records and concluded that she had no medically determinable impairment during the relevant period. His finding was confirmed by Henry Schniewind, M.D., in another psychiatric review performed on January 4, 2011.

Ms. Brown returned to Dr. Chan on October 7, 2010. She complained about her join pain and muscle pain. Dr. Chan reviewed the history of her illness and noted that distribution of joint pain was widespread and severity of pain was moderate, ranging from dull to sharp. After physical exam, Dr. Chan assessed chronic fibromyalgia, slightly improved. Ms. Brown was evaluated by Dr. Chan again on December 21, 2010. The result of physical examination was similar to that of October 7, 2010. However, Dr. Chan noticed that her fibromyalgia was worsening.

## C.    *Subjective Testimonial Reports*

Ms. Brown completed a questionnaire on pain on July 27, 2010. She reported that her pain had started three and a half years earlier in her back and joints. Despite medication, the pain remained constant and had spread to other places in her body. She explained that she had to rest at home on a typical

day.  Ms. Brown also submitted a function report on July 27, 2010.  She wrote that she was suffering from insomnia due to her pain.  She could not dress, bathe, feed or shave herself because she had extreme pain, could not stand steady on her feet and had no feeling in hands to move items.  With her husband's help, she was able to care for two dogs and a bird.  She could perform light-house cleaning when she felt no extreme pain, but she had to stop and rest for one hour every thirty minutes.  She could occasionally cook frozen food.  She was also able to drive or ride in a car and shop for necessities.  Her social activities were limited to visiting her mother and the doctors.  She reported that her illness had affected her ability to lift, walk, climb stairs, squat, sit, bend, kneel, stand, concentrate, understand, memorize, follow instructions and complete tasks.  She alleged that she could walk only twenty feet before she stopped and rested for an hour.

During her administrative hearing, Ms. Brown testified that she stopped working as a data entry clerk in 2007 due to the numbness in her hands and pain in her neck, which prevented her from sitting and working through all the work hours.  She also reported that she experienced fatigue, stress and serious headaches.  Eventually the symptoms got so serious that she could not even sit at the computer for ten or fifteen minutes.

Ms. Brown testified that she could only hold small things, for example, cups, pens, forks and knives, for a short amount of time with both hands providing support underneath. She reported that she could not feel the things nor manipulate them very well. She claimed that she burned her hands a lot and pinched her fingers in a door due to the lack of sensation. She could sign her own signature but would usually drop the pen down or stop to shake her hands for a minute. She was able to type for a Google search but unable to write an email. Overall, she explained that her hands felt like wearing big, thick, heavy gloves.

When asked to describe the pain, Ms. Brown claimed that the pain fluctuated a great deal. On a bad day, she experienced soreness and muscle spasm in her lower back, hips and shoulders. She described the muscle spasm as a "stabbing in the leg" or a sudden jerk. Because of the pain, she had to change positions very often.

Ms. Brown also reported that the computer screen bothered her eyes and that she became very agitated about flashing lights. She said she tried to avoid the newspaper because she was unable to hold it and the ink smelled dirty to her. She said she was in fear and emotionally depressed all the time due to the illness and she tried very hard to stay focused.

**D.    *Disability Standard and the Decision of the
        Administrative Law Judge***

   1.    The Standard for Disability Determination

 To determine whether a claimant is entitled to Social
Security Disability Insurance benefits, the Administrative Law
Judge (the "ALJ") must follow a five-step sequential inquiry.
20 C.F.R. § 404.1520; *see Goodermote* v. *Sec'y of Health & Human
Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

   At the first step, the ALJ considers the claimant's
work activity.  If he or she is doing substantial gainful
activity, then the ALJ will find no disability. 20 C.F.R. §
404.1520 (4)(i).

   At the second step, the ALJ evaluates the medical
severity of the claimant's impairment(s).  If the claimant
does not have a severe medically determinable physical or
mental impairment that meets the duration requirement in
§ 404.1509, or a combination of impairments that are severe
and meet the duration requirement, the ALJ will find no
disability.  20 C.F.R. § 404.1520 (4)(ii).

   At the third step, the ALJ also considers the medical
severity of the impairment(s).  If the claimant has an
impairment(s) that meets or equals one of the listings in
Appendix 1 to the social security regulations, the ALJ will

find that he or she is disabled. 20 C.F.R. § 404. 1520
(4)(iii).

At the fourth step, the ALJ makes an assessment of the
claimant's residual functional capacity and his or her past
relevant work. If the claimant can still do the past
relevant work, the ALJ will find no disability. 20 C.F.R.
§ 404.1520 (4)(iv).

At the fifth step, the ALJ makes an assessment of the
residual functional capacity and the claimant's age,
education, and work experience to see if he or she can make
an adjustment to other work. If the claimant can make an
adjustment to other work, the ALJ will find that he or she
is not disabled. 20 C.F.R. § 404.1520 (4)(v).

2. The ALJ's Decision

In this case, the ALJ first concluded the Ms. Brown last
met the insured status requirements of the Social Security Act
on December 31, 2009. He then found that Ms. Brown was not
engaged in substantial gainful activity during the relevant
period. Based upon the records, ALJ concluded that through the
date last insured, Ms. Brown suffered from obesity,
fibromyalgia, carpal tunnel syndrome and thoracic outlet
syndrome. However, none of these impairments or combination of
impairments medically met the clinical requirements of an
impairment in the Appendix 1.

Next the ALJ concluded that "through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she was able to lift and/or carry 10 pounds frequently." He found that "she was able occasionally to climb, balance, stoop, kneel, crouch, or crawl. She was able occasionally to push or pull or reach overhear with her upper extremities, and could frequently handle, finger and feel. She was limited to only occasional interaction with the public, co-workers, and supervisors, and to simple, routine and repetitive instructions."

In reaching this conclusion about the claimant's residual functional capacity, the ALJ considered all the symptoms and medical opinions. He followed a two-step process in considering Ms. Brown's symptoms as required by 20 CFR 404.1529. First, he evaluated the medical records from Dr. Gagnon, Dr. Galvin. Dr. Marks, Dr. Eneyni, Dr. Feoktistov. Dr. Schur, Dr. Becker, Dr. Kam-Hansen, Dr. Biber and Dr. Tavakkolizadeh and concluded that Ms. Brown's medically determinable impairments could reasonably be expected to cause the alleged symptoms.

Second, he concluded that although Ms. Brown's assertions were "partially credible, her description of her limitations as of her date last insured are not consistent with the medical evidence of record." In support of his conclusion, the ALJ explained that none of Ms. Brown's treating sources found the

debilitating pain that Ms. Brown had reported since 2007.  In particular, he observed that the medical examinations revealed very few objective findings of the alleged limitations: there were no findings of a complete lack of sensation in Ms. Brown's hands and no evidence of injuries to her hands or fingers as a result of her numbness.

With respect to the medical records from Dr. Gagnon, the ALJ gave some weight to the doctor's opinion on April 4, 2008, finding that Ms. Brown had some difficulty with the use of her hands.  However, the ALJ gave little weight to Dr. Gagnon's opinion on August 5, 2010, which concluded Ms. Brown's chronic muscle pain prevented her from working at all.  That opinion was accorded little weight because it merely "conveys the claimant's reports to Dr. Gagnon, not his objective opinion."  Conversely, the ALJ indicated that he had given great weight to the limitations assessment by Dr. Schaff, the state agency medical consultant, "in the absence of any treating source statement of specific findings of the limitations."  He concluded that Dr. Schaff's opinion was "the most consistent with the medical evidence as a whole."

The ALJ further noted that Ms. Brown reported no decrease in the frequency of her fibromyalgia attacks after her gastric bypass surgery, but she "felt better and more energized in between the attacks."  He noted that Ms. Brown did not submit

any evidence of medical treatment between May of 2009 and June 8, 2010.

Based on his assessment of Ms. Brown's residual functional capacity, the ALJ concluded that "through the date last insured, the claimant was capable of performing past relevant work as a data entry clerk" and that she was "not under a disability, as defined in the Social Security Act".

## II.  DISCUSSION

Ms. Brown contends that the Administrative Law Judge made two legal errors in his denial of social security insurance benefits: (1) he erred in assessing residual function capacity before determination of her subjective complaints of pain and limitation; and (2) he failed to follow the proper legal standards for evaluation of her subjective complaints of pain provided in *Avery* v. *Sec'y of Health & Human Servs.*, 797 F.2d 19 (1st Cir. 1986)

### A.  *Standard of Review*

A district court has the power to enter a judgment "affirming, modifying, or reversing" a decision of the Commissioner of the Social Security Administration "with or without remanding the cause for a hearing." 42 U.S.C. § 405(g). My review of the Commissioner's decision is "limited to determining whether the ALJ used the proper standards and found

facts based on the proper quantum of evidence." *Ward* v. *Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

Questions of law are reviewed de novo. *Seavey* v. *Barnhart*, 276 F.3d 1, 9 (1st Cir.2001); *Ward*, 211 F.3d at 655. By contrast, the Commissioner's factual findings are treated as conclusive only if they are "supported by substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is that which "a reasonable mind, reviewing the record as a whole, could accept . . . as adequate to support [the Commissioner's] conclusion." *Ortiz* v. *Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991) (citing *Rodriguez* v. *Secretary of Health and Human Services*, 647 F.2d 218, 222 (1st Cir.1981)). I am bound by the Commissioner's factual findings unless they are "derived by ignoring evidence, misapplying law, or judging matters entrusted to experts." *Nguyen* v. *Chater*, 172 F.3d 31, 35 (1st Cir.1999) (per curiam).

**B.    The Administrative Law Judge's alleged failure to follow the sequential evaluation protocol**

Ms. Brown first contends that the Administrative Law Judge failed to follow the correct standard because he determined residual functional capacity before consideration of her subjective complaints of pain and then used that conclusion as a "bootstrap to create a post hoc determination of credibility". She alleges that the ALJ was mistaken about the sequence because

he asserted in his decision that "the claimant's statements concerning the intensity, persistence and limiting effects of the symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment."

I agree with Ms. Brown that an ALJ should ordinarily assess the credibility of the subjective complaints *before* determination of the claimant's residual function capacity. *See Alberts* v. *Astrue*, No. 11-11139-DJC, 2013 WL 1331110, at *11 (D. Mass. Mar. 29, 2013) (citing *Longerman* v. *Astrue*, 2011 WL 5190319 (N.D.Ill.2011) (observing that "[a]s the Seventh Circuit has made clear, finding statements that support the RFC credible and disregarding statements that do not 'turns the credibility determination process on its head' " (quoting *Brindisi* v. *Barnhart*, 315 F.3d 783, 787–88 (7th Cir.2003)))).

However, I disagree with Ms. Brown that the ALJ's conclusive statement alone demonstrated his failure to follow the correct sequence. In *Alberts*, a case to which both parties refer, the ALJ made an almost identical statement when he asserted that the claimant's "statements concerning the intensity, persistence and limiting effects of her symptoms are not credible to the extent they are inconsistent with the RFC determination." *Alberts*, No. 11-11139-DJC, 2013 WL 1331110, at *11 (D. Mass. Mar. 29, 2013). Judge Casper, however, did not

stop her analysis with this boilerplate statement. Instead, she carefully reviewed the ALJ's opinion and found that he had properly considered each of the *Avery* factors. *Id.* at 13. Accordingly, she concluded that the ALJ's statement "was commentary to explain the scope of a credibility determination that he had already made using the correct legal standard to evaluate her statements. " *Id.* at 12.

In *Cabral* v. *Colvin*, No. 12-11757-FDS, 2013 WL 4046721, at *5 (D. Mass. Aug. 6, 2013), a case the claimant heavily relies on, Judge Saylor followed the practical approach employed in *Alberts* to a similar conclusive statement. To be sure, Judge Saylor ultimately concluded that the ALJ failed to follow the correct legal standard in his evaluation. *Id.* at 5. Yet he reached that conclusion only after he found that the ALJ did not in fact analyze the *Avery* factors. *Id.* at 8.

Because Ms. Brown offers no reason in the present case to justify her wooden textual approach as opposed to the practical approach adopted by Judge Casper in *Alberts* and Judge Saylor in *Cabral*, I decline to find error of law from the ALJ's conclusive statement alone.

**C. *The Administrative Law Judge's alleged failure to follow the proper standards in assessing credibility of the claimant's subjective complaints***

Ms. Brown's principal contention is that the Administrative Law Judge failed to follow the proper legal standards in

assessing the credibility of her subjective complaints of pain. Before discussing the merits of her arguments, an overview of the correct legal standard for credibility determination regarding pain is warranted.

In assessing a claimant's subjective complaints of the pain, an ALJ must first find a "clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." *Avery*, 797 F.2d 19, at 21. Once a medically determinable physical or mental impairment has been established, the ALJ must consider "the intensity, persistence, and functionality limiting effects of the symptoms" so as to "determine the extent to which the symptoms affect the individual's ability to do basis work activities." SSR 96-7p (codified at §404.1529(a)). This second step requires a finding regarding the credibility of the claimant's subjective statements of her pain and its functional effects based on a consideration of the entire case record. *Id.*

When evaluating the credibility of the claimant's subjective complaints, the ALJ must consider the so-called "*Avery* factors": (1) the nature, location, onset, duration, frequency, radiation, and intensity of pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side effects of any pain medication; (4)treatment, other than

medication, for pain relief; (5) functional restrictions; and (6) the claimant's daily activities. *Avery*, 797 F.2d at 29; (codified at 20 C.F.R. § 404.1529 (c)(3)).

It is inappropriate for the ALJ to rely solely on objective medical evidence to determine the credibility of the subjective complaints. To be sure, "objective medical evidence is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of an individual's symptoms and effects those symptoms may have on the individual's ability to function." SSR 96-7p (codified at § 404.1529(c)(2)). However, "the absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider." SSR 96-7p (codified at § 404.1529(c)(2)). In other words, the ALJ must consider evidence in addition to medical tests. *Nguyen*, 172 F.3d 31, at 34 (citing 20 C.F.R. § 404.1529 (c)).

When the ALJ makes a finding as to the credibility of subjective testimony, the finding "must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]." *Da Rosa* v. *Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986). The Social Security Administration's policy interpretation further provides that the

ALJ's finding is not deemed sufficient if the ALJ only makes a conclusive statement or simply recites the Avery factors that are described in the regulations for evaluating symptoms. SSR 96-7p.

In light of the prescribed evaluation process, Ms. Brown first argues that the ALJ erred in finding her subjective complaints not credible solely because they were not substantiated by the objective medical records. In supporting this argument, Ms. Brown focuses on the following paragraph from the ALJ's opinion:

> The claimant alleges that she has had debilitating pain since 2007. However, none of her numerous treating sources have described her as appearing to be in significant pain . . . . Examinations have consistently shown very few objective findings to support the claimant's alleged limitations . . . . There are no findings of a complete lack of sensation in the claimant's hands, or of the claimant having significant pain on palpation. There is no evidence that the claimant has suffered from falls or injuries of her hands of fingers as a result of her numbness.

While the paragraph cited reflects the ALJ's consideration of the dissonance between medical records and the subjective complaints, the ALJ did not end with this alone. Instead, he continued his discussion by offering three additional reasons for his disregard of the complaints.

The ALJ first explained that he gave less weight to her primary physician's medical opinion dated April 4, 2008, because "Dr. Gagnon's treatment records do not support an inability to

perform any work activities at all." He also gave little weight to Dr. Gagnon's opinion dated on August 5, 2010, because that opinion only recited what Ms. Brown reported to him.

The ALJ then identified three inconsistencies in Ms. Brown's subjective reports of pain and disability: she claimed regular periods when she must stay in bed but the records show she reported this only once; she did not seek mental health treatment or medication during relevant period though she claimed her mental limitations; she reported feeling more energized after the surgery and she failed to submit evidence of medical treatment between May of 2009 and June 8, 2010.

Finally, the ALJ noted that he relied heavily upon the assessment by the state agency medical consultant, Dr. Schaff "in the absence of any treating source statement of specific limitations".

Because the ALJ articulated a number of supportable justifications for his finding of credibility, it is not fair to say that he discredited the complaint's subjective testimony solely based on its incompatibility with objective medical records. Therefore, I will not overturn the ALJ's credibility determination on that ground.

Moving to the Ms. Brown's second argument. She claims that, because the ALJ's opinion failed to provide specific reasons for his findings on the credibility, it is impossible to

determine which of her statements were considered credible and whether they were discredited based upon evidence in the record. She alleges that "[t]he ALJ engaged in cherry picking and inappropriate emphasis, particularly, upon minor comments, to the exclusion of fair consideration of all the evidence upon the record as a whole." I interpret this argument as alleging that the ALJ's findings were too general and not supported by substantial evidence from the record.

Ms. Brown cites *Cabral* and *Bazile* v. *Apfel*, 113 F. Supp. 2d 181 (D. Mass. 2000) in support of her contention. In *Cabral*, Judge Saylor observed: "[a]lthough a factual summary of the Avery factors is often sufficient to demonstrate that the ALJ considered those factors, more may be required where the evidence does not clearly support the ALJ's credibility determination." *Cabral*, No. 12-11757-FDS, 2013 WL 4046721, at *10 (D. Mass. Aug. 6, 2013); *see also Pires* v. *Astrue*, 553 F. Supp. 2d 15, 24 (D. Mass. 2008) ("Though at times courts have considered the recitation of such [objective medical findings] to be enough to demonstrate that the ALJ considered it, that is not the case where the evidence as laid out does not support the ALJ's credibility determination.") (internal citation omitted). Because the ALJ in *Cabral* failed to analyze the *Avery* factors in detail and because "there was substantial evidence in support of plaintiff's subjective allegations of pain", Judge Saylor

remanded the case to the ALJ to make specific findings as to the plaintiff's credibility. *Id.* at 9-11.

In *Bazile*, Judge Young articulated a similar standard: "general findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Bazile* v. *Apfel*, 113 F. Supp. 2d at 188 (citing *Lester* v. *Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). While the ALJ in *Bazile* offered some reasons to discredit the Bazile's testimony, including objective medical evidence and the minimal medication the plaintiff received, Judge Young concluded that "it is too broad" to disregard Bazile's description of her daily living activities. *Id.* at 187-88. Accordingly, he remanded the case for reconsideration.[1] *Id.* at 190.

Ms. Brown's reliance on *Bazile* and *Cabral* is misplaced. The explanations the ALJ offered in the present case are more extensive and specific than the reasoning found inadequate in *Bazile* and Cabral. In fact, the ALJ here offered several reasons to impugn the parts of Ms. Brown's testimony he regarded as not credible.

---

[1] Judge Young also held that because the plaintiff, whose native language was Spanish, appeared to misunderstand many questions at the hearing, the ALJ failed to give due consideration to the effects of her medication. *Bazile*, 113 F. Supp. 2d 181, 189-90 (D. Mass. 2000).

First, the ALJ properly questioned the intensity of Ms. Brown's pain and her alleged complete disability because none of the treating sources except Dr. Gagnon's medical opinions provided medical support for those complaints.  For example, Dr. Feoktistove noticed on April 18, 2008 that Ms. Brown, having mild tenderness in hands and wrist and anterior shoulder tenderness on palpation, did not appear to have acute pain.  On April 8, 2008, Dr. Eneyni observed she showed normal gait, strength, sensation, and reflexes.  This assessment was echoed in Dr. Chan's evaluation on July 1, 2010, which showed Ms. Brown had normal muscle strength and tone with no atrophy and experienced no pain, crepitation or contracture with range of motion.

The ALJ further explained that he gave less weight to the medical opinions by Ms. Brown's primary physician because the opinion listed no specific limitations and was not supported by his treatment records.  The ALJ's position is clearly justified. *See* 20 C.F.R. § 404.1527(c) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.")

Second, Ms. Brown's allegations about the persistence of her pain and limitation were also properly discredited.  The ALJ noticed that while she testified at the hearing that she had to

stay in bed until 2 or 3 in the afternoon, she only reported one such episode in her treatment and was able to carry on with daily activities a few days afterwards. Social Security regulations allow an ALJ to rely on such an inconsistency to discredit the claimant's subjective complaints. *See, e.g.,* SSR 96-7P (codified at 20 CFR 404.1529(c)(4) ("One strong indication of the credibility of an individual's statements is their consistency . . . [including] consistency of the individual's own statements."); *Frustaglia* v. *Secretary of Health and Human Services*, 829 F.2d 192, 195 (1st Cir. 1987) (upholding the ALJ's finding of credibility when the claimant made inconsistent and contrary statements.)

In addition to the inconsistency recited above, the ALJ also recognized the incompatibility between Ms. Brown's testimony at the hearing alleging "she never feels like she is improving" and her report of feeling "better and more energized" after her gastric bypass surgery. The ALJ found that Ms. Brown did not seek medical treatment between May of 2009 and June 8, 2010, five days before she filed for social security disability insurance benefit. From the evidence the ALJ could reasonably conclude that Ms. Brown did not seek treatment because her situation improved due to the surgery and the symptoms were not severe enough to prompt her to see a doctor. *See* SSR 96-7p (codified at 20 CFR 404.1529(c)(4) ("the individual's statements

may be less credible if the level or frequency of treatment is inconsistent with the level of complaints," provided that "the adjudicator first consider[s] any explanations that the individual may provide, or other information in the case record"); *Tsarelka* v. *Sec'y of HHS*, 842 F.2d 529, 534 (1st Cir. 1988) ("Implicit in a finding of disability is a determination that existing treatment alternatives would not restore a claimant's ability to work.").

Even assuming, arguendo, that the ALJ's reasoning had been too general to offer specific refutation, the determination should still be upheld because his finding of credibility is supported by substantial evidence in the record. *See Frustaglia*, 829 F.2d at 195 (holding that "although more express findings regarding head pain and credibility than those given here are preferable", the ALJ's opinion may be upheld when the finding is adequately supported by substantial evidence.)

In his opinion the ALJ derived most of his residual functional limitation determination from the findings of the state agency medical consultant, Dr. Schaff. Because Dr. Schaff had the opportunity to review all of the medical evidence from all of the claimant's treating sources, the ALJ's reliance on those findings to discredit Ms. Brown's subjective complaints was proper. *See* SSR 96-6p; ("[T]he opinion of a State agency medical or psychological consultant . . . may be entitled to

greater weight than a treating source's medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment.") *See generally* 20 CFR § 404.1527(e).

Furthermore, Ms. Brown's own subjective testimony about her daily life lends additional support to the ALJ's finding of limitation. The ALJ found that, during the relevant period, Ms. Brown was able to perform sedentary work except lifting and/or carrying 10 pounds frequently. She was also found able occasionally to climb, balance, stoop, kneel, crouch or crawl and occasionally push or pull reach overhead, grasp or twist with her bilateral upper extremities. His findings were in fact consistent with the claimant's own reports regarding her daily life: she was able to cook frozen food, care for two dogs and a bird with her husband's help, perform light-house cleaning when she felt no extreme pain, drive or ride in a car and shop for necessities and visit her mother and doctors. In other words, Ms. Brown's subjective reports of her daily life supported, rather than undermined, the ALJ's determination of her physical limitation. *See Balaguer* v. *Astrue*, 880 F.Supp.2d 258 (D. Mass. 2012) (affirming the hearing officer's finding that the claimant's reported limitations in her daily activities was not

credible because she could generally take her four dogs out, cook, clean, go grocery shopping, write, read, and play games).

In sum, the ALJ made specific findings regarding the credibility of Ms. Brown's subjective complaints and those findings are supported by substantial evidence in the record. Accordingly, I find no basis to disturb the ALJ's determinations regarding credibility.

### III. CONCLUSION

For the reasons set forth more fully above, I hereby AFFIRM the decision of the Commissioner denying benefits.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE